**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**OFFICE CREATE CORPORATION,**

                                                        **Plaintiff,**

        **vs.**                                                                                **1:23-CV-91**
                                                                                                     **(MAD/DJS)**

**1ST PLAYABLE PRODUCTIONS, LLC, and**
**EMILIE T. (TOBI) SAULNIER,**

                                                        **Defendants.**
_____

**APPEARANCES:**                                          **OF COUNSEL:**

**LABGOLD LAW**                                          **MARC R. LABGOLD, ESQ.**
1900 Reston Metro Plaza, Suite 600              **PATRICK J. HOEFFNER, ESQ.**
Reston, Virginia 20190                                  **MEGAN C. LABGOLD, ESQ.**
Attorneys for Plaintiff

**WHITEMAN, OSTERMAN & HANNA LLP**        **WILLIAM S. NOLAN, ESQ.**
One Commerce Plaza                                      **ANNA V. SEITELMAN, ESQ.**
99 Washington Avenue – 19th Floor              **ARTHUR A. NIX, ESQ.**
Albany, New York 12210
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

    Plaintiff Office Create Corporation ("Office Create" or "Plaintiff") commenced this action

against Defendants 1st Playable Productions, LLC ("1st Playable") and Emilie T. ("Tobi")

Saulnier (collectively, "Defendants") alleging (1) copyright infringement under the Copyright Act

of 1976, 17 U.S.C. §§ 101, *et setq.*; (2) contributory copyright infringement under federal

common law; (3) trademark infringement, unfair competition, false designation of origin and

trade dress infringement under the Lanham Act, 15 U.S.C. §§ 1117 and 1125(a); (4) contributory

trademark infringement under federal common law; (5) unfair competition under New York

common law; and (6) unjust enrichment.  *See* Dkt. No. 1.  On January 17, 2024, prior to the close

of discovery, Plaintiff moved for partial summary judgment on its copyright infringement claims.

*See* Dkt. No. 47-1.  On September 20, 2024, the Court denied Plaintiff's motion as premature,

finding that the record is replete with questions of fact and "that discovery is needed to fully and

appropriately resolve the issues presented on Plaintiff's motion for summary judgment." Dkt. No.

63 at 8.

Currently before the Court is Plaintiff's second motion for partial summary judgment, this

time seeking summary judgment on its claim that Defendants are liable for contributory

trademark infringement.  *See* Dkt. No. 59.

## II. BACKGROUND

**A.    The Parties**

Plaintiff Office Create is a corporation established under the laws of Japan, with its

principal place of business located at 2-10-16, Aobadai, Aoba-ku, Yokoshama-shi, Kanagawa,

Japan.  *See* Dkt. No. 1 at ¶ 2.  Plaintiff is the owner of intellectual property relating to the

successful video game franchise "Cooking Mama," including, among other things, registered

trademarks and copyrights.  *See id.* at ¶ 3.

Defendant Saulnier is the founder, CEO and sole shareholder of Defendant 1st Playable.

*See* Dkt. No. 65 at ¶ 2.  1st Playable is a small business located in Troy, New York, focused on

developing educational software and other games for video game publishers.  *See id.*

**B.    The Creation of Cooking Mama and Agreement to License New Versions**[1]

---

[1] The following information is solely being provided to place the dispute in the present
matter in the proper context and, while some of these facts may be in dispute, they are not
material to the Court's disposition of the pending motion.

Office Create originally created the video game franchise "Cooking Mama" for the Nintendo DS platform in 2006. *See* Dkt. No. 1-1 at 14. Cooking Mama quickly became Office Create's most successful game and Office Create went on to create further Cooking Mama games together with a number of spinoff games such as Babysitter Mama, Gardening Mama, and Handicraft Mama. *See id.* The original Cooking Mama on the Nintendo DS capitalized on the DS' touch screen technology to allow the user to mimic cooking actions. *See id.* Office Create also developed a version of Cooking Mama for the Sony Wii platform. *See id.* In 2015, Office Create created a mobile app version of Cooking Mama, which players could download for free but which allowed Office Create to monetize the game through in-app purchases. *See id.*

The Nintendo Switch gaming platform was launched in 2017. *See id.* at 15. The Switch platform included new controllers, known as "Joy Cons," which were designed to disconnect from the Switch handheld device, and which contain motion detection technology. *See id.* Game designers could use this feature of the Switch hardware to create games that encouraged greater physical engagement from players. *See id.* According to Noriyasu Togakushi, President and Representative Director of Office Create, Nintendo asked Office Create if it intended to release a Switch version of Cooking Mama which would use this new feature, but at the time Office Create was uncertain about the future of Switch as a gaming platform and was focusing on the development of the Cooking Mama mobile app so did not pursue the development of a Switch version of Cooking Mama itself. *See id.*

In November 2017, Mr. Fujioka of Four Winds Inc., a Japanese entity, approached Office Create on behalf of his client, Steve Grossman. *See* Dkt. No. 1-1 at 15. Mr. Fujioka explained that the contact was prompted by Mr. Grossman's desire to obtain a license to develop a Switch version of a Cooking Mama game. *See id.* At this time, Mr. Grossman had not yet formed his

company, Planet Entertainment, LLC.  *See id.*  Planet Entertainment was formed in 2018, and according to Mr. Grossman, prior to formation of the company, he had been "CEO of various game publishing companies" and a consultant to "Universal Vivendi Games and Midway Games (now owned by Warner Bros)." *Id.*

Office Create was initially reluctant to license Cooking Mama, which it had never done before, but, once the Switch platform was established and showing signs of success, Office Create reconsidered its position and in June 2018, Office Create contacted Mr. Fujioka to facilitate discussions with Mr. Grossman and his team.  *See id.* at 15-16.  Following a meeting in July 2018, Office Create decided to grant Mr. Grossman's company, Planet Entertainment, a license to develop a Cooking Mama game for the Switch platform.  *See id.* at 16.  In August 2018, Office Create and Planet Entertainment entered into a Licensing Agreement for the development and sale of a Switch version of a Cooking Mama game.  *See* Dkt. No. 67-1 at ¶ 5.  Pursuant to the terms of the Licensing Agreement, Mr. Fujioka was to act as an intermediary between Office Create and Planet Entertainment to assist with translation of Japanese into English and vice versa. *See id.* at ¶ 9.

## C.    The Cooking Mama Development Agreement

According to Defendant Saulnier, "[i]n or around January 2019, 1st Playable entered into a Video Game Software Development Agreement with Console Classics Limited ("Console Classics"), which 1st Playable understood to be an arm or division of Planet Entertainment, LLC ..., and controlled by Planet, to develop the new Cooking Mama game.  *See* Dkt. No. 65 at ¶ 3; *see also* Dkt. No. 65-1 (the "Cooking Mama Development Agreement").  Pursuant to the Cooking Mama Development Agreement, 1st Playable is identified as the "Sub-Contractor" and Console as the "Developer." *Id.* at ¶ 4.  "Licensed Materials" are defined as "the *Cooking Mama Cookstar*

4

property and all tangible and intangible assets and property rights compromising the *Cooking Mama Cookstar* property." Dkt. No. 65-1 at ¶ 1.1(f).  "Licensor" is defined as "the person (if any) from whom the Developer is licensing the Licensed Materials." *Id.* at ¶ 1.1(g).

According to the Cooking Mama Development Agreement, "Sub-Contractor shall develop the Work Product titled 'Cooking Mama Cookstar' and shall deliver it to Developer in such form as required for submission at the relevant Milestone." *Id.* at ¶ 2.1.  In the event that the Developer finds that the submission failed to comply with the applicable Milestone, the Developer was required to notify 1st Playable, who was required to make any noted modifications.  *See id.* at ¶ 2.3.  As to Licensed Materials, the agreement provides that "the provision of the Licensed Materials and any of the Licensor's other intellectual property to the Sub-Contractor by the Developer is solely to enable the Sub-Contractor to develop the Work Product in accordance with the terms of this Agreement." *Id.* at ¶ 5.2.  As to the relationship between Console and 1st Playable, the agreement provides that the "Work Product developed by Sub-Contractor is done at Developer's request," *id.* at ¶ 5.3, that the "Sub-Contractor is an independent contractor," *id.* at ¶ 12.1, and "shall not have any authority to make agreements or representations on Developer's behalf," *id.* at ¶ 12.2.  The Cooking Mama Development Agreement further contains representations and warranties that Console had "acquired all rights necessary to the Licensed Material to be able to develop the [Cooking Mama game], and that [1st Playable's] use as provided herein of the Licensed Material does not and will not infringe upon the rights of any person, firm, corporation, or third party." *Id.* at ¶ 7.2.

1st Playable developed the Cooking Mama: Cookstar games for the Nintendo Switch and Playstation 4 ("PS4") platforms.  *See* Dkt. No. 67-1 at ¶ 10.  Defendants admit that during the development of the game, 1st Playable prepared "game builds" of the Switch version of the

Cooking Mama: Cookstar game, which they provided to Planet Entertainment. *See id.* at ¶ 11. Planet Entertainment then submitted the game builds to Office Create for review and approval as required under the Licensing Agreement. *See id.* at ¶ 12.

**D.      Development of Cooking Mama: Cookstar**

The main period of development for the Cooking Mama game was from September 2018 to March 2020. *See* Dkt. No. 1-1 at 20.[2]  Throughout this period, Defendants developed various iterations of the game and, through Mr. Grossman, provided these iterations to Plaintiff for input on any changes that needed to be made. *See id.* at 20-21.  On December 25, 2019, Mr. Togakushi of Office Create wrote to Mr. Grossman, Planet Entertainment, and Defendant Saulnier to inform them that Office Create could not approve the current Cooking Mama: Cookstar game build.  Dkt. No. 67-1 at ¶ 13.  Following receipt of the December 25, 2019 correspondence, Defendants continued work on the game build and Office Create continued to send feedback concerning the rejected Cooking Mama: Cookstar game build. *See* Dkt. No. 59-3 at ¶ 7.  On January 6, 2020, Defendant Saulnier sent the latest game build to Joe McHale, a Senior Producer at Planet Entertainment, who then submitted the game to Nintendo of America. *See* Dkt. No. 59-2 at ¶ 15; Dkt. No. 67-1 at ¶ 15; Dkt. No. 59-4 at 3-5.  Plaintiff contends that it never approved the game for submission to Nintendo of America. *See* Dkt. No. 67-1 at ¶¶ 15, 17.

On March 16, 2020, Mr. Fujioka forwarded to Grossman, Planet Entertainment, and Defendants a letter from Office Create in which Office Create provided the reasons why it could

---

[2] Again, the following information is solely being provided to place the dispute in the present matter in the proper context, including the events that led to the deteriorating relationship between all relevant parties.  While some of these facts may be in dispute or are before the Court in inadmissible form, they are not material to the Court's disposition of the pending motion.

not approve the current game build.  *See* Dkt. No. 67-1 at ¶ 20.  Office Create contends that on

March 26, 2020, the Switch Version of Cooking Mama: Cookstar was released on the Nintendo

eShop without Office Create's knowledge or approval.  *See id.* at ¶ 21; Dkt. No. 59-3 at ¶ 10.

That same day, Nintendo removed the Cooking Mama: Cookstar game from the Nintendo eShop.

*See id.* at ¶ 22.  Although Defendants admit that they were aware the game was removed from the

eShop, Defendant Saulnier contends that she was informed by Planet Entertainment "that it was

illegally removed for reasons not consistent with their licensing contract with [Office Create].  1st

Playable was not privy to communications or decisions between [Planet Entertainment and Office

Create]." *Id.* at ¶ 23; Dkt. No. 65 at ¶ 25.

**E.**     **Termination of the Licensing Agreement**

On March 30, 2020, Office Create provided notice to Planet Entertainment of the

immediate termination of the Licensing Agreement.  *See* Dkt. No. 67-1 at ¶ 24.  On April 15,

2020, Office Create issued the following press release:

> Re:     Unauthorized Release of Cooking Mama: Cookstar by
> Planet Entertainment, LLC
>
> We would like to thank our fans and customers for their support
> over the years for the Cooking Mama franchise.  As many of you
> know, Planet Entertainment LLC (Headquarters: Connecticut, USA;
> "Planet") recently released "Cooking Mama: Cookstar" for sale in
> the U.S., Europe and Australia.  This was an unauthorized release in
> breach of Planet's contract with Office Create.
>
> In August 2018, Office Create licensed Planet to develop the
> Cooking Mama: Cookstar game for Nintendo Switch™.
> Unfortunately, the quality of the game builds failed to meet the
> standards that our customers expect and deserve.  Office Create
> rejected a wide range of deficiencies affecting the overall feel,
> quality and content of the game.  Yet, despite being contractually
> obligated to correct the identified deficiencies and resubmit the
> corrected game for Office Create's approval, Planet proceeded to
> release Cooking Mama: Cookstar without addressing all of the
> rejections and without Office Create's approval.

> We have also learned that Planet and/or its European distributor has been promoting an upcoming European release of a PS4™ version of Cooking Mama: Cookstar.  Office Create has not licensed Planet (or any other entity) to create any Cooking Mama games for PS4™.  Office Create itself has not been involved in the development of any PS4TM Cooking Mama game.
>
> On March 30, 2020 Office Create notified Planet of its immediate termination of the license due to Planet's intentional material breach of the license contract.  Despite such notice, Planet continues to advertise and sell the unauthorized version of Cooking Mama: Cookstar on its website in willful violation of Office Create's rights.  To date, Planet has not confirmed the status of the unauthorized PS4™ version.
>
> Office Create is evaluating all legal action against Planet to protect our customers, intellectual property rights and the Cooking Mama series.  In the meantime, we thank our customers and loyal Cooking Mama fans for their continued support and sincerely regret any confusion and disappointment that has been caused by Planet's conduct.

Dkt. No. 67-1 at ¶ 25; Dkt. No. 59-3 at ¶ 12.

Defendants were aware of Office Create's press release and Defendant Saulnier emailed Planet Entertainment that same day, asking the following question: "With [Office Create] going public with their stance today, is there a planned response from planet?" *Id.* at ¶ 26.  According to Defendant Saulnier, she sent that email to Planet Entertainment because "Planet had assured [her] that it was in the legal right, so [she] expected Planet to respond, since Planet claimed that [Office Create] was acting illegally and in bad faith." Dkt. No. 65 at ¶ 28.  In response, Mr. Grossman assured Defendant Saulnier that he was "working on a response with lawyers." *Id.* at ¶ 29.  Later that day, Mr. Grossman forwarded Defendant Saulnier an email from his attorneys at Prior Cashman that included the following responsive language to Office Create's press release: "Unfortunately, creative differences arose as Cooking Mama Cookstar was near completion that were outside the scope of our agreement and the game design approved by Office Create.  By

contract, Planet is fully within its rights to public Cooking Mama Cookstar. There is no active litigation or ruling that precludes Planet from publishing the game." *Id.* at ¶ 29.

Thereafter, Defendants developed a PS4 version of Cooking Mama: Cookstar. *See* Dkt. No. 67-1 at ¶ 33. In February 2021, Defendants supplied Planet Entertainment with the PS4 version of Cooking Mama: Cookstar, which Planet Entertainment released to Sony Interactive Entertainment ("Sony"). *See id.* at ¶ 34. The PS4 version of the game was released to the public in or around March 2021. *See id.* at ¶ 35.

**F.    Arbitration Between Office Create, Planet Entertainment and Grossman**

In April 2021, Office Create initiated binding international commercial arbitration seated in New York, New York under New York law and administered by the International Chamber of Commerce against Planet Entertainment and Grossman. *See* Dkt. No. 67-1 at ¶ 37.[3] 1st Playable and Ms. Saulnier were not parties to the arbitration. On October 3, 2022, the three-member arbitral tribunal issued a final award in Office Create's favor. *See id.* at ¶ 38. The Arbitral Award was confirmed by the United States District Court for the Southern District of New York, with judgment entered in Office Create's favor. *See id.* at ¶ 39.

The Arbitral Tribunal found, among other things, that the Switch and PS4 versions of Cooking Mama: Cookstar infringed Office Create's Cooking Mama trademark in violation of 15 U.S.C. § 1114. *See id.* at ¶ 40 (citing Dkt. No. 1-1 at ¶¶ 126 and 184(k)-(n)). The Arbitral Tribunal further concluded, among other things, that the promotion, distribution, and sale of the Cooking Mama: Cookstar games by Planet Entertainment constituted infringement of Office

---

[3] The Court acknowledges that Defendants contest the admissibility of the evidence relating to this arbitration. Again, this information is being provided solely for purposes of placing the present matter in the appropriate context. Issues regarding the admissibility of evidence and what may be properly considered in deciding the pending motion will be addressed below.

Create's Cooking Mama trademarks. *See id.* at ¶ 41 (citing Dkt. No. 1-1 at ¶ 126). Additionally, the Arbitral Tribunal expressly found that "Planet did not have the right to release a PS4 version of the Game." *Id.* at ¶ 42 (citing Dkt. No. 1-1 at ¶¶ 105-113, 126). The Arbitral Tribunal specifically concluded that Planet Entertainment infringed Office Create's trademark in violation of 15 U.S.C. § 1114 with respect to the Switch and PS4 version of Cooking Mama: Cookstar. *See id.* at ¶ 46 (citing Dkt. No. 1-1 at ¶¶ 122-126, 140-141 and 184(j)).

Plaintiff contends that "Defendants continued to use the Cooking Mama mark, the Mama character, and Office Create's name on 1st Playable's website until the Arbitral Tribunal ordered the destruction of 'all copies of all infringing labels, packages, advertisements, software code (in all forms and formats), art files, resources, Games, Products and other articles, including the deletion of all digital files on cloud servers, backup drives, and personal computers under the physical, legal or contractual control of the Respondents or **1st Playable**.'" *Id.* at ¶ 43 (emphasis added). Defendant Saulnier notes that she received an email on October 7, 2022, from Planet Entertainment stating that "[w]e have to remove all things Cooking Mama Cookstar from our website and social channels. Could you shut down the info about Cooking Mama Cookstar from your website?" Dkt. No. 65 at ¶ 40. Defendant Saulnier indicates that she immediately complied with the request and inquired whether this was due to a decision from the Arbitral Tribunal. *See id.*

Although Defendant Saulnier was not a party to the arbitration, she provided a witness statement that was introduced during the proceedings, reviewed McHale's statement for accuracy, testified during the hearing, and assisted with responses to the Tribunal's post-hearing questions as a vendor and developer. *See* Dkt. No. 67-1 at ¶ 44. Defendant Saulnier was not represented by

counsel during the arbitration, but was assisted by Planet Entertainment's counsel in the preparation of her witness statement and in preparing to testify at the hearing. *See id.* at ¶ 45.

### III. DISCUSSION

**A.    Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.    Contributory Trademark Infringement**

In order to succeed on a claim of contributory or vicarious trademark infringement, a plaintiff must establish that direct infringement took place. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement ... and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it") (citations omitted); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 104 (2d Cir. 2010) (holding that "'if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit'") (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 (1982)). In order to prevail on a trademark infringement claim, "a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale ... or advertising of goods or services,' ... (5) without the plaintiff's consent" and (6) "that defendant's use of that mark 'is likely to cause confusion ... as to affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [plaintiff].'" *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (internal quotations omitted).

Contributory infringement is a theory of secondary liability that arises when "a manufacturer or distributor intentionally induces another to infringe a trademark, or ... continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood*, 456 U.S. at 853-54; *see also Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 64 (2d Cir. 1992). "Although '*Inwood*'s test for contributory trademark infringement

applies on its face to manufacturers and distributors of goods,' other courts, including the Seventh

and Ninth Circuits, have 'extended the test to providers of services.'" *Red Rock Sourcing LLC v.*

*JGX LLC*, No. 21-cv-1054, 2024 WL 1243325, *27 (S.D.N.Y. Mar. 22, 2024) (citing *Tiffany*

*(NJ)*, 600 F.3d at 104; *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143,

1148-49 (7th Cir. 1992); *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 984 (9th

Cir. 1999)). In particular, the Ninth Circuit has determined that "contributory trademark

infringement applies to a service provider if he or she exercises sufficient control over the

infringing conduct." *Tiffany (NJ)*, 600 F.3d at 104-05 (citing *Lockheed Martin Corp.*, 194 F.3d at

984). The Second Circuit has yet to determine that *Inwood* applies outside the context of

manufacturers and distributors, but in *Tiffany (NJ)*, the Second Circuit — in assuming without

deciding that *Inwood* applied to an online marketplace (eBay) — explained as follows: "A service

provider must have more than a general knowledge or reason to know that its service is being

used to sell counterfeit goods. Some contemporary knowledge of which particular listings are

infringing or will infringe in the future is necessary." *Id.* at 107. Additionally, in the context of

contributory trademark infringement claims brought against a service provider, the plaintiff must

establish that the service provider exercises sufficient control over the infringing conduct for the

service provider to be held liable. *See Omega SA v. 375 Canal, LLC*, No. 12-cv-6979, 2013 WL

2156043, *3 (S.D.N.Y. May 20, 2013); *Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R.*,

No. 07-cv-6959, 2010 WL 4968072, *3 (S.D.N.Y. Dec. 6, 2010) (citations omitted).

### 1. Direct Infringement

In their response, Defendants note that, as with its first motion for summary judgment,

"Plaintiff attempts to bind Defendants to the results of an arbitration to which they were not

parties and not represented by counsel. On this issue, Plaintiff offers a mere two sentences in its

submissions, one acknowledging that establishment of direct infringement is required, and the other stating that the Arbitral Tribunal found that Planet had directly infringed upon Plaintiff's trademarks." Dkt. No. 65-5 at 9-10. Because Defendants were not parties to the arbitration, they contend that Plaintiff cannot invoke the doctrine of collateral estoppel and they cannot be bound by its factual findings. *See id.* at 10. In its reply, Plaintiff contends that it is not relying on collateral estoppel to bind Defendants. *See* Dkt. No. 67 at 6. Rather, Plaintiff argues that the Arbitral Award is admissible evidence that the Court may consider in finding that it has established that direct infringement occurred in this matter by Planet Entertainment. *See id.*

In general, collateral estoppel, which the Court will refer to as issue preclusion, "bars litigation of an issue when '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (quoting *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)). "The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion," whereas "the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with ... the party opposing the application of issue preclusion." *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996).

The preclusive effect of an arbitration decision (or lack thereof) was explained by the Supreme Court in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36 (1974). In that case, the court held that a plaintiff was not precluded from filing suit under Title VII even though he had raised a similar claim during the arbitration of a prior contractual dispute with his employer because of the important differences between the two forums:

> In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.

*Id.* at 49-50. The court noted that "[t]he policy reasons for rejecting the doctrines of election of remedies and waiver in the context of Title VII are equally applicable to the doctrines of res judicata and collateral estoppel." *Id.* at 49 n.10. In addition, the court stated that while not entitled to preclusive effect, "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Id.* at 60.

Similarly, in *McDonald v. West Branch*, 466 U.S. 284 (1984), the Supreme Court addressed the issue of "whether a federal court may accord preclusive effect to an unappealed arbitration award in a case brought under [42 U.S.C. § 1983]." *Id.* at 285. The court held that, "in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel effect to an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement." *Id.* at 292. But the Supreme Court has not squarely faced the question of whether an arbitrator's factual findings (as opposed to the decision itself) can create issue preclusion in a later federal suit.

Nor has the Second Circuit, which has noted that "the preclusive effect of arbitrations is a difficult and complex issue." *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005). A recent unpublished case is nonetheless informative. In *Siddiqua v. New York State Dept. of Health*, 642 Fed. Appx. 68 (2d Cir. 2016), the Second Circuit found that an arbitration decision resolving contract-based claims under a CBA had no preclusive

effect on a plaintiff's statutory claim under the Family and Medical Leave Act ("FMLA"). *Id.* at 70. The court noted that "Siddiqua sought only to vindicate her contractual rights under the terms of the collective bargaining agreement in submitting her grievance to arbitration." *Id.* at 71. Citing *Gardner-Denver*, the court stated that "to the extent that the arbitration of Siddiqua's contractual rights in this case might be 'similar to, or duplicative of, the substantive rights secured by' the FMLA, this prior arbitration does not preclude a federal court from reconsidering all factual issues underlying her statutory FMLA claims." *Id.* The court noted, in a footnote, that *Gardner-Denver* "prohibits a court from dismissing Siddiqua's FMLA claims by giving preclusive effect to findings of fact made by the Arbitrator in resolving Siddiqua's contract claims." *Id.* at 71 n.2.

      Here, Plaintiff acknowledges that issue preclusion does not apply in this case, but instead argues the Arbitral Award is simply evidence that may be considered to support a finding of direct infringement. While this principal is generally supported, the Court finds that it is inappropriate in the present matter because of the numerous glaring deficiencies in Plaintiff's motion. *See Gardner–Denver Co.*, 415 U.S. at 60 (holding that, while not entitled to preclusive effect, "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate"). First, much of the Arbitral Award is based on evidence that is not part of the record in the present matter. For example, the Tribunal received a considerable amount of evidence in the form of testimony, written affidavits, and other relevant evidence in support of the claims, including the relevant Licensing Agreement between Office Create and Planet Entertainment. *See* Dkt. No. 1-1 at 13, 19, 35. Here, however, the record is bereft of such evidence.

Among the evidence that Plaintiff submitted with its motion for summary judgment that was also part of the record before the Arbitration Tribunal, that evidence is of limited evidentiary value. For example, Plaintiff submitted draft, unsigned affidavits of Joe McHale of Planet Entertainment and Defendant Saulnier, which were to be submitted at arbitration. *See* Dkt. Nos. 59-12, 59-14. In addition to being unsigned, these affidavits are clearly not in their final form, as they include annotated edits that had yet to be incorporated or rejected.

Additionally, as Defendants note, although Plaintiff previously submitted the Licensing Agreement entered into between Office Create and Planet Entertainment as an exhibit attached to its April 19, 2023 motion to dismiss, Plaintiff did not submit the agreement as an exhibit to its current motion. *See* Dkt. No. 22-4. Moreover, the previously submitted Licensing Agreement was unauthenticated. *See id.* As such, this document is inadmissible in support of the pending motion. *See Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) ("[U]nauthenticated documents cannot be considered on a motion for summary judgment ... documents must be authenticated by and attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence"); *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) ("[T]he court may consider [on summary judgment] any material that would be admissible or useable at trial, including properly authenticated and admissible documents or exhibits) (internal citation and quotation marks omitted); *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (holding that unauthenticated documents are improper summary judgment evidence); *Cortez v. Stubbs*, No. 3:21-cv-316, 2024 WL 13432222, *2 (D. Nev. Mar. 29, 2024); *Wiesner v. F.B.I.*, 668 F. Supp. 2d 157, 159 (D.D.C. 2009) (citing cases).

Further, Plaintiff did not even bother to include the Arbitral Award as an exhibit attached to its motion for summary judgment. Rather, the Arbitral Award was simply attached as an exhibit to Plaintiff's unverified complaint. Some courts have held that, just as allegations in an unverified complaint cannot be used to support or defeat summary judgment, exhibits attached to an unverified complaint are not properly before the court in considering a motion for summary judgment. *See Lath v. BMS Cat*, No. 16-cv-534, 2018 WL 1835972, *2 (D.N.H. Apr. 17, 2018) (holding that, although a copy of a written instrument attached to an unverified complaint is part of the pleading, attaching the document to the unverified complaint "does not make that document admissible at summary judgment" and that exhibits submitted with a motion for summary judgment, that are not authenticated and attached to an affidavit that meets the requirements of Rule 56(e), are not admissible for purposes of summary judgment) (citations omitted).[4]

Moreover, unlike the cases set forth above, Defendants were not even parties to the arbitration. Rather, Defendants' role in the arbitration was limited to providing written statements and live testimony in their roles as subcontractors to Planet Entertainment and Mr. Grossman. Although Plaintiff claims that it is not asking this Court to find that the Arbitral Award has preclusive effect on the issue of direct infringement, it is the only competent evidence it submitted in support of this issue.[5]

---

[4] In its reply, Plaintiff relies on Defendants' submissions in response to its first motion for summary judgment, which Plaintiff implies are admissions by Defendants that support a finding of direct infringement by Planet Entertainment. *See* Dkt. No. 67 at 7-8 (quoting Dkt. No. 46-2 at ¶¶ 63-64; Dkt. No. 46-1 at ¶ 6). Contrary to Plaintiff's contention, the quoted language does not admit to the underlying facts, but simply recite what the Arbitral Award found.

[5] In its Decision and Order denying Plaintiff's first motion for partial summary judgment, the Court highlighted many of these issues and specifically held that "Defendants are not bound by said arbitration." Dkt. No. 63 at 3 n.5. Despite this holding, Plaintiff decided to rely on the Arbitral Award again as sufficient to establish this element against Defendants who, as previously noted, were not parties to the arbitration. Additionally, in its previous decision, the Court noted a

(continued...)

Accordingly, the Court denies Plaintiff's motion for partial summary judgment on this ground.

### 2. Contributory Trademark Infringement

In its motion for summary judgment, Plaintiff argues that Defendants gained actual or constructive knowledge of Planet Entertainment's trademark infringement through Plaintiff's rejection of various game builds in its communications with Planet Entertainment. *See* Dkt. No. 59-1 at 16-18. Plaintiff also relies on the fact that it communicated its alleged termination of the licensing agreement with Planet Entertainment to Planet Entertainment. *See id.* Although Defendants do not generally dispute that they were aware of these communications between Office Create and Planet Entertainment, Defendants argue that this evidence is insufficient to

---

⁵(...continued)
whole host of other issues with Plaintiff's motion, which they have repeated in the second motion for partial summary judgment. Notably, the Court highlighted the fact that Plaintiff's statement of material facts repeatedly (and inappropriately) cited to its own unverified complaint as support of factual assertions and relied on unauthenticated exhibits. *See id.* at 3-8, nn. 5-15. Compounding these issues is the fact that Plaintiff relied on paragraphs of the unverified complaint that Defendants specifically denied or cited these paragraphs for propositions that expanded upon the language in the unverified complaint in significant ways. The present motion contains nearly all of the same issues.

Additionally, the Court notes that, throughout its reply statement of material facts, Plaintiff repeatedly argues that Defendants improperly raised legal arguments in the response to the statement of material facts and that such legal arguments should be disregarded. *See, e.g.*, Dkt. No. 67-1 at ¶ 38. Ironically, however, Plaintiff then proceeds to engage in legal arguments in its reply statement of material facts, with citations to caselaw in support of its arguments. *See id.*

Plaintiff also repeatedly argues that, "to the extent Defendants wished to deny or rebut this evidence, they were required to provide citations to the record where an alleged factual issue arises. Having failed to do so, there is no basis for any denial and certainly no genuine issue of material fact." *See, e.g.*, Dkt. No. 67-1 at ¶ 38. Plaintiff is correct that to create an issue of fact, a party opposing a motion for summary judgment must cite to relevant evidence in the record that creates the issue of fact. However, that obligation only arises if the moving party has supported their motion with relevant and admissible evidence, which Plaintiff has quite often failed to do.

establish the knowledge element of Plaintiff's contributory trademark infringement claim. *See* Dkt. No. 65-5 at 14-16.

As noted above, contributory infringement is a theory of secondary liability that arises when "a manufacturer or distributor intentionally induces another to infringe a trademark, or ... continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood*, 456 U.S. at 853-54; *see also Mimran*, 975 F.2d at 64. Here, Plaintiff relies on the latter basis for contributory trademark infringement, *i.e.*, that Defendants continued to supply its product to Planet Entertainment whom they knew or had reason to know was engaging in trademark infringement. The parties agree that this element can be satisfied through either actual or constructive knowledge of Planet Entertainment's actual trademark infringement. Defendants, however, contend that Plaintiff has failed to establish either actual or constructive knowledge.

Plaintiff argues, among other things, that Defendants gained actual or constructive knowledge of Planet Entertainment's trademark infringement through Plaintiff's rejection of various game builds in its communications with Planet Entertainment, because they were aware that Planet Entertainment submitted the build of the game to Nintendo of America and Nintendo subsequently removed the game from its eShop, and because Plaintiff communicated its alleged termination of the licensing agreement to Planet Entertainment, which Defendants had knowledge of. *See* Dkt. No. 59-1 at 16-18. The Court agrees with Defendants that questions of fact preclude granting summary judgment on this aspect of Plaintiff's contributory infringement claim.

As noted above, 1st Playable developed the Cooking Mama game according to its contractual obligations set forth in the Cooking Mama Development Agreement, which contains clear representations and warranties that Planet Entertainment (d/b/a Console Classics) acquired

all rights necessary to develop the Cooking Mama game. *See* Dkt. No. 65-1 at ¶ 7.2. The communications between the parties make clear that Office Create was fully aware of and consented to 1st Playable's performance of development work on the Cooking Mama game. *See* Dkt. No. 65 at ¶ 13. In its motion, Plaintiff cites to cases where knowledge was established through "cease-and-desist letters, officer and employee statements, promotional material, and industry experience." Dkt. No. 59-1 at 14 (citing, *inter alia*, *Ranieri v. Adirondack Dev. Grp., LLC*, 164 F. Supp. 3d 305, 346 (N.D.N.Y. 2016); *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 503-04 (6th Cir. 2013)). Here, however, none of these factors are present.

During 1st Playable's development of the game, nothing before the Court establishes that Office Create, Planet Entertainment or Console Classics informed 1st Playable that it should stop its development work, or that 1st Playable or Planet Entertainment was violating, or even potentially violating, any trademark rights or laws. 1st Playable was not specifically advised of Office Create's trademark rights, nor did it receive any cease-and-desist notices from any party, let alone from Office Create. *See* Dkt. No. 65 at ¶ 16. According to Defendant Saulnier, she and 1st Playable were specifically informed by Planet Entertainment that everything was being worked out between Planet Entertainment and Office Create and they were instructed to continue working on the game as they had strict deadlines to meet to hit retail windows. *See id.* at ¶ 14.

To the extent that Office Create is relying on its communications with Planet Entertainment, 1st Playable notes that it was not privy to the specific submissions of game builds sent by Planet Entertainment to Office Create, Office Create's rejection of certain game builds, nor most of Planet Entertainment's and Office Create's review interactions. *See id.* at ¶ 16. According to Defendant Saulnier, this separation of communication is a normal practice in work-for-hire game development. Planet Entertainment's role was to interact with Office Create, and

21

any effort by 1st Playable to circumvent the chain of communication would have been improper and inconsistent with industry practice. Additionally, Defendants contend that it is normal practice for licensors to withhold approval for game builds until the very end of production, or even after the first party review. *See id.* at ¶ 19. Such withholding had no impact on 1st Playable's contractual obligations to continue developing the game in any way. Moreover, Defendant Saulnier contends that Planet Entertainment continually informed 1st Playable that while the goal was to continue to make changes to try to address Office Create's requests, the Licensing Agreement did not require that all requests be addressed. *See id.* at ¶ 18.

Defendant Saulnier also notes that it is a normal practice for developers to supply unapproved game builds to companies such as Nintendo of America. This process is referred to as a "pre-check," and it is a way to ensure that no issues on Nintendo's end will remain while the parallel game content is being finalized. Defendant Saulnier contends that a submission to Nintendo does not equate to a representation that the game build is finalized, approved, or to be made available for purchase. Moreover, licensors such as Office Create are not typically involved in the logistical details of first party clearance and submission.

Accordingly, based on these facts, the Court is unable to conclude that 1st Playable should have known about Planet Entertainment's alleged violation of Office Create's trademark rights because of Office Create's disapproval of game builds or Planet Entertainment's submission to Nintendo, which are common industry practices. Moreover, Office Create did not terminate its Licensing Agreement with Planet Entertainment until March of 2020, so 1st Playable could not have possible known about any trademark violation or even Office Create's intention to terminate its Licensing Agreement with Planet Entertainment during the game development process.

While Office Create alleges that it provided notice of the termination of its Licensing Agreement with Planet Entertainment on March 30, 2020, it did not directly communicate this termination to 1st Playable.  According to Defendant Saulnier, Planet Entertainment consistently represented to her that Office Create had not validly terminated the Cooking Mama license. Plaintiff's own exhibits show that Mr. Grossman reassured Defendant Saulnier that he was "working on a response with lawyers" to Office Create's press statement.  *See* Dkt. No. 59-9. Later that day, Mr. Grossman forwarded an email from his attorneys, Prior Cashman, that stated what Planet Entertainment and Grossman had previously informed Defendant Saulnier: "Unfortunately, creative differences arose as Cooking Mama Cookstar was near completion that were outside the scope of our agreement and the game design approved by Office Create.  By contract, Planet is fully within its rights to publish Cooking Mama Cookstar.  There is no active litigation or ruling that precludes Planet from publishing the game." Dkt. No. 59-10.[6]

Similarly, as discussed above, 1st Playable developed a PS4 version of Cooking Mama: Cookstar because it was contractually obligated to do so.  *See* Dkt .No. 65 at ¶ 36.  At the time that 1st Playable supplied the PS4 version of the game, Defendants contend that they had been informed by Planet Entertainment that this version comported with the Licensing Agreement and Planet Entertainment repeatedly assured Defendants that it was operating within its rights under its confidential contract with Office Create.  *See id.*  On October 7, 2022, upon being informed of

---

[6] The Court notes that, according to the Arbitral Award, Cooking Mama: Cookstar was released on the Nintendo Switch eShop on March 26, 2020, only to be pulled later that day.  *See* Dkt. No. 1-1 at 26.  Following its removal from the Nintendo eShop, Planet Entertainment continued to distribute the game through other outlets.  *See id.*  It is unclear what, if any, work Defendants performed on the Nintendo Switch version of the game following Office Create's March 2020 termination of its Licensing Agreement with Planet Entertainment.

the Arbitral Award, Defendants immediately destroyed and removed any potentially infringing content from their website to comply with the tribunal's order.[7]

Based on all of the evidence presented, the Court finds that questions of fact preclude finding that Defendants acted with the requisite knowledge to support a claim for contributory trademark infringement. According, the Court denies Plaintiff's motion on this alternative ground.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, the Court hereby

**ORDERS** that Plaintiff's second motion for partial summary judgment (Dkt. No. 59) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 18, 2025
      Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**

---

[7] The Court notes that the evidence submitted and facts alleged pertaining to Defendants' development and the release of the PS4 version of the game are considerably more sparse than those provided relating to the development and release of the Nintendo Switch version of the game.